1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT FOR THE

6                    EASTERN DISTRICT OF CALIFORNIA

7

8   KIM-C1, LLC,                        )   1:10-cv-591  AWI MJS
                                        )
9                      Petitioner,      )   ORDER ON PETITIONER'S
          v.                            )   MOTION TO CONFIRM
10                                      )   ARBITRATION AWARD AND
    VALENT BIOSCIENCES                  )   ORDER ON RESPONDENT'S
11  CORPORATION,                        )   MOTION TO VACATE
                                        )   ARBITRATION AWARD
12                     Respondent.      )
    _____)   (Doc. Nos. 1, 7, 30, 34)
13

14

15          This case stems from a Licensing Agreement ("the Agreement") between Petitioner Kim-

16  C1, LLC ("Kim") and Respondent Valent Biosciences Corp. ("Valent").[1]  In 2010, the parties

17  attended an arbitration.  Kim seeks to have the arbitration award confirmed under 9 U.S.C. § 9,

18  that is, the Federal Arbitration Act ("FAA").  Valent seeks to vacate the arbitration award.  For

19  the reasons that follow, the Court will deny Valent's motion and confirm the arbitration award.

20

21                          **GENERAL BACKGROUND**

22          From the submissions of the parties, in July 1999, Kim and Valent entered into the

23  Agreement in order for Kim to provide Valent a license to market, sell, and promote for use on

24  specified crops an agriculture chemical known as CPPU.  See Respondent's Exs. 1.4, 1.7.  As

25  one of the Agreement's recitals states:

26          WHEREAS, the Parties wish to enter into a licensing, development and supply

27  _____

28          [1]The Agreement is actually between Kim and Abbott Laboratories.  At some point, Valent obtained or
    succeeded Abbott's interest in the Agreement.

arrangement, upon terms and conditions to be defined below, respecting the [Kim] technology and Products, whereby [Valent] shall have the exclusive right to use, market, promote, and sell certain products containing the [Kim] technology for use on Grapes, as defined below, in the Territory, defined below, and upon the terms contained therein.

Id. at 1.4.  The Agreement identifies the territory to which the license applies as the United States.  See id. at 1.6, 1.7.  As indicated in the quoted recital, the crop for which Valent is to sell CPPU is identified as grapes (kiwis appear to have been added through a later addendum).  See id. at 1.4, 1.5, 1.7, 1.42.  Section 2.2 of the Agreement, which is entitled "[Valent] Exclusivity," establishes five conditions that Valent must meet in order "to maintain its exclusive right and license" to sell CPPU.  See id. at 1.7, 1.8.  Section 2.2(c) sets one of the requirements as the purchase of a specified minimum quantity of CPPU.  See id.  Of particular note, the end of § 2.2 provides: "If [Valent] fails to meet the above conditions in the Territory, [Valent's] exclusive right to sell Products in the Territory shall be deemed non-exclusive . . . ."  Id. at 1.8.

In 2008, the parties had an arbitration with arbitrator Michael Roberts.  The arbitrator found for Kim on 6 of 9 issues and declared Kim to be the prevailing party.  See Respondent's Ex. 6.11.

In 2010, the parties had a second arbitration, again with arbitrator Michael Roberts.  On March 30, 2010, the arbitrator issued a final award.  The arbitrator found in favor of Kim on 5 of 6 issues and declared Kim to be the prevailing party.  See Respondent's Ex. A at pp. 6-8.

On March 31, 2010, Kim filed a petition to confirm the 2010 arbitration award.  On June 28, 2010, Valent filed a motion to vacate the 2010 award.

## I   MOTION TO VACATE

### A.   Review Under Federal Law or Illinois Law

*Petitioner's Position*

In the Petition to Confirm Arbitration, Kim requests that the Court confirm the arbitration award pursuant to 9 U.S.C. § 9.  See Court's Docket Doc. No. 30.  In the opposition to Valent's motion to vacate, Kim argues that the award should not be vacated under either the FAA or Illinois law.  See Court's Docket Doc. No. 40 at pp. 6, 10-13.  In the sur-reply, Kim argues that

1   Illinois law applies due to the Agreement's choice of law provision.  See Court's Docket Doc.

2   No. 46 at pp. 2 (citing § 21.3 of the Agreement), 11-12.

3           *Respondent's Position*

4           Valent argues that there is no material distinction in the standard of review between the

5   Illinois arbitration act and the FAA, and relies on both federal and Illinois case law to argue for

6   vacatur.  Valent also argues that the parties agreed that Illinois law applied to the Agreement and

7   that Illinois state courts would have exclusive jurisdiction.  Because the parties chose Illinois law

8   to govern the contract, the Illinois arbitration act applies.  Also, Kim sought, and continues to

9   seek here, statutory interest as provided by Illinois law.

10          *Legal Standard*

11          "When an agreement falls within the purview of the FAA, there is a strong default

12  presumption . . . that the FAA, not state law, supplies the rules for arbitration."  Johnson v.

13  Gruma Corp., 614 F.3d 1062, 1066 (9th Cir. 2010); Fidelity Fed. Bank, FSB v. Durga Ma Corp.,

14  386 F.3d 1306, 1311 (9th Cir. 2004); Sovak v. Chugai Pharm. Co., 280 F.3d 1266, 1269 (9th Cir.

15  2002).  "To overcome that presumption, parties to an arbitration agreement must evidence a

16  'clear intent' to incorporate state law rules for arbitration."  Johnson, 614 F.3d at 1066; Fidelity,

17  386 F.3d at 1311; Sovak, 280 F.3d at 1269.  "A general choice-of-law clause within an

18  arbitration provision does not trump the presumption that the FAA supplies the rules for

19  arbitration."  Johnson, 614 F.3d at 1066; Sovak, 280 F.3d at 1270.  A general choice of law

20  clause will be interpreted as electing state substantive law and FAA procedural law.  See Fidelity,

21  386 F.3d at 1312; Sovak, 280 F.3d at 1270.  "[W]here the FAA's rules control arbitration

22  proceedings, a reviewing court must also apply the FAA standard for vacatur."  Johnson, 614

23  F.3d at 1067; see Fidelity, 386 F.3d at 1312.  Where "state arbitration rules control arbitration

24  proceedings, [courts] must apply the state vacatur standard."  Johnson, 614 F.3d at 1067.

25          *Contractual Clauses At Issue*

26          There are two provisions of the Agreement at issue, § 21.3 and § 21.4.  Section 21.3

27  reads:

28          Governing Law.  This Agreement shall be construed, interpreted and governed in

3

accordance with the laws of the United States of America and the State of Illinois, except for choice of law rules.  Subject to the terms of section 21.4, the Parties consent to the jurisdiction of the competent courts of the State of Illinois which shall have exclusive jurisdiction over all disputes that may arise under or in connection with this Agreement.

Section 21.4b[2] reads:

> Dispute Resolution.  Any dispute or claim arising out of or in connection with this Agreement shall be resolved as follows: (i) for a period of thirty (30) days after a dispute arises the respective appropriate officer of the Parties shall negotiate in good faith in an effort to resolve the dispute, and (ii) if the dispute has not been resolved at the close of such thirty (30) days period the matter shall be submitted by the Parties to arbitration before a single arbitrator in accordance with the rules of the CPR Institute for Dispute Resolution as identified in Exhibit 5.0.

Respondent's Ex. 1.23.

*Discussion*

There is no dispute that the Agreement falls within the general purview of the FAA.  See 9 U.S.C. § 2 (contracts "involving commerce" are under the FAA); Johnson, 614 F.3d at 1066. As such, there is a strong default presumption that the FAA provides the governing procedural rules, including review of the arbitration award for purposes of confirmation and vacatur.  The clause cited by the parties is a choice of law provision that adopts not only the laws of Illinois, but also the "laws of the United States of America."  See Respondent's Ex. 1.23.  As a federal law, the FAA is a law of the United States.  As a law of the United States, it would appear that the FAA is incorporated into the Agreement through the choice of law clause.  There is nothing in § 21.3 that indicates that the FAA does not apply.  Indeed there is nothing in § 21.3 that even purports to specifically address arbitration.  The rule is that a general choice of law clause will not defeat the strong presumption in favor of the FAA's applicability.  Johnson, 614 F.3d at 1066; Chiron Corp. v. Ortho Diagnostic Sys., 207 F.3d 1126, 1131 (9th Cir. 2000).  The general selection of both Illinois law and "the laws of the United States" does not show a clear intent that only Illinois law governs the procedures of arbitration.  Cf. id. at 1066-67; Fidelity, 386 F.3d at 1312; Sovak, 280 F.3d at 1369-70; Chiron, 207 F.3d at 1131.

A portion of § 21.4b states that arbitration will be conducted in conformance with the

---

[2]There is not actually a "§ 21.4b."  There is a misnumbering in the Agreement since there are two sections marked as "21.4."  "§ 21.4b" is the Court's method of identifying the second of the two section 21.4's.

1   rules of the CPR Institute for Dispute Resolution.  See Respondent Ex. 1.23.  In cases where

2   contracts select the law of a particular state and then indicate that the rules of a particular

3   arbitrator apply, the Ninth Circuit interprets such contracts as mandating the application of state

4   substantive law regarding the contract and the application of federal procedural law regarding

5   arbitration.  See Fidelity, 386 F.3d at 1312; Sovak, 280 F.3d at 1369-70.  Vacatur is considered to

6   be a procedural issue.  See Johnson, 614 F.3d at 1066-67; Fidelity, 386 F.3d at 1312.  Sections

7   21.3 and 21.4b therefore indicate that federal procedural law, i.e. the FAA, govern the arbitration

8   motion to vacate at issue.  See Johnson, 614 F.3d at 1066-67;  Fidelity, 386 F.3d at 1312; Sovak,

9   280 F.3d at 1369-70.

10      Valent argues that the language of § 21.3 that vests Illinois courts with "exclusive

11   jurisdiction" shows that Illinois law regarding vacatur applies.  The Court cannot agree.  First,

12   there are no cases cited that interpret this language in connection with arbitration.  Second, the

13   particular language is in the nature of a venue selection clause, it does not deal with arbitration.

14   If a general choice of law clause will not overcome the presumption that the FAA applies, the

15   Court fails to see how language that merely sets the location where lawsuits are to be filed would

16   overcome the strong presumption.  Since Abbott (as well as Valent) is an Illinois corporation, the

17   clause suggests that it has more to do with Abbott's convenience than with the law governing

18   arbitration.[3]  Third, as discussed above, § 21.3 selects the laws of the United States, in addition to

19   Illinois law, as governing the Agreement.  Nothing would prevent Illinois courts from applying

20   "United States law," including the FAA.  See Baltin v. Alaron Trading Corp., 128 F.3d 1466,

21   1469 (11th Cir. 1997) ("Federal courts and state courts have concurrent jurisdiction to enforce

22   the FAA."); Virgin Islands Hous. Auth. v. Coastal Gen. Constr. Servs. Corp., 27 F.3d 911, 915

23   (3d Cir. 1994) (same).

24      Because the clauses cited do not clearly show the Illinois arbitration law was intended to

25   govern arbitration, federal law and the FAA govern whether to confirm or vacate the arbitration

26   award in this case.  See Johnson, 614 F.3d at 1066-67; Fidelity, 386 F.3d at 1311-12; Sovak, 280

27

28      [3]Again, the Agreement was originally signed by Kim and Abbott labs.  The Agreement and Petition indicate
    that Valent and Abbott are Illinois corporations.  See Respondent's Ex. 1.4; Court's Docket Doc. Nos. 1, 30 at ¶ 1.

1  F.3d at 1269-70 (applying the FAA instead of Illinois arbitration law);[4] <u>Chiron</u>, 207 F.3d at 1131.

3  **B.      Non-Appealability Clause**

4  *Parties' Arguments*

5  Kim argues that the arbitrator's award is not subject to review by any court.  As part of

6  the Agreement, the arbitrator's award may be confirmed by courts, but the award itself is not

7  otherwise reviewable or appealable.

8  Valent argues that, under Illinois law, arbitration awards are subject to vacatur under the

9  Illinois arbitration act, irrespective of contractual language that would forbid review.

10  Accordingly, the arbitration award may be reviewed.

11  *Contractual Provision At Issue*

12  Paragraph 9 of the Agreement's Exhibit 5 reads:  "The rulings of the [arbitrator] and the

13  allocation of fees and expenses shall be binding, non-reviewable, and non-appealable and may be

14  entered as a final judgment in any court having jurisdiction."  Respondent's Exhibit 1.36

15  (hereinafter "Paragraph 9").

16  *Discussion*

17  Valent relies on two Illinois cases, *Johnson v. Baumgardt*, 576 N.E.2d 515 (Ill. App. Ct.

18  1991) and *First Merit Realty Servs. v. Amberly Square Apts.*, 869 N.E.2d 1111 (Ill. App. Ct.

19  2007), in contending that the arbitration award is reviewable despite Paragraph 9.  However, as

20  discussed above, vacatur of arbitration awards is a procedural matter that is governed by the

21  FAA, not Illinois law.  <u>See</u> <u>Johnson</u>, 614 F.3d at 1066-67; <u>Fidelity</u>, 386 F.3d at 1311-12; <u>Sovak</u>,

22  280 F.3d at 1269-70.  Neither *Johnson* nor *First Merit* apply to this case.  <u>See</u> <u>id.</u>

23  In terms of federal cases, the effect of a clause like Paragraph 9 is not clear.  The Second

24  Circuit has reviewed a clause that provided that an arbitrator's decision was not "subject to any

26  [4]Valent cites several Illinois state appellate cases for the proposition that an Illinois choice of law clause
will deem the Illinois arbitration act to be part of the contract, as though expressly referred to and incorporated
27  therein.  However, in *Sovak*, the Ninth Circuit dealt with a contract that had an Illinois choice of law clause.  Relying
on the rule that a general choice of law clause does not trump the presumption that the FAA supplies the rules for
28  arbitration, *Sovak* held, "we must conclude that the Agreement incorporates the FAA's rules for arbitration, but
Illinois substantive law applies in all other respects."  <u>Sovak</u>, 280 F.3d at 1270.  This Court must follow *Sovak*.

1  type of review or appeal whatsoever." <u>Hoeft v. MVL Group, Inc.</u>, 343 F.3d 57, 63 (2d Cir.

2  2003).  Fearing that interpreting the clause so as to foreclose any judicial review would turn the

3  federal courts into mere rubber stamps, the Second Circuit held that the non-appealability clause

4  could not prevent review of the arbitration award under the vacatur standards of 9 U.S.C. § 10(a).

5  <u>See</u> <u>id.</u> at 64-66; <u>see also</u> <u>Team Scandia, Inc. v. Greco</u>, 6 F.Supp.2d 795, 798 (S.D. Ind. 1998).

6       The Eleventh Circuit has reviewed an agreement that provided for "binding, final, and

7  non-appealable" arbitration.  The Eleventh Circuit held that a "binding, final, and non-

8  appealable" arbitration award "does not mean the award cannot be reviewed.  It simply means the

9  parties have agreed to relinquish their right to appeal the merits of their dispute; it does not mean

10  that the parties relinquish their right to appeal an award resulting from an arbitrator's abuse of

11  authority, bias, or manifest disregard of the law." <u>Rollins, Inc. v. Black</u>, 167 Fed. Appx. 798,

12  799 n.1 (11th Cir. 2006); <u>see also</u> <u>Team Scandia</u>, 6 F.Supp.2d at 798 (interpreting a non-

13  appealability clause that provided for binding, final, and non-appealable arbitration).

14       The Third Circuit has reviewed a clause that read, "the decision of the arbitrators shall be

15  final and unreviewable for error of law or legal reasoning of any kind and may be enforced in any

16  court having jurisdiction of the parties." <u>Communications Consultant, Inc. v. Nextel Communs.</u>

17  <u>of the Mid-Atlantic, Inc.</u>, 146 Fed. Appx. 550, 552 (3d Cir. 2005) (hereinafter "Nextel").  The

18  Third Circuit explained that it had read "similar language" as eliminating the ability to challenge

19  the arbitration panel's "legal determinations in federal court." <u>Id.</u> (explaining <u>Tabas v. Tabas</u>, 47

20  F.3d 1280, 1288 (3d Cir. 1995)).  The Third Circuit continued, "In the presence of such language,

21  the only permissible basis upon which a litigant may challenge the panel's award is if the litigant

22  can show that the panel's actions were influenced by 'corruption, fraud, or partiality,' or that the

23  panel failed to provide a hearing to consider each party's views prior to issuing its decision."

24  <u>Nextel</u>, 146 Fed. Appx. at 552-53.

25       To the Court's knowledge, the Ninth Circuit has not fully examined this issue.  In

26  *Kyocera*, an en banc Ninth Circuit panel held that parties could not expand the scope of federal

27  review of an arbitration award beyond what 9 U.S.C. § 10(a) provided. <u>Kyocera Corp. v.</u>

28  <u>Prudential-Bache T Servs.</u>, 341 F.3d 987, 1000 (9th Cir. 2003) (en banc).  In reaching its

7

1  decision, however, the *Kyocera* court noted, "the decision to contract for a *narrower* standard of

2  review than the courts generally apply in the absence of a statutory command is a decision that

3  may be less troublesome than the attempt to contract for a *broader* standard of review than that

4  authorized by Congress, although we need not resolve that question here." Id. at 998 n.16

5  (emphasis in original).

6       In a case that pre-dates *Kyocera*, the Ninth Circuit acknowledged, "While it has been held

7  that parties to an arbitration can agree to eliminate all court review of the proceedings, the

8  intention to do so must clearly appear." Aerojet-General Corp. v. American Arbitration Ass'n,

9  478 F.2d 248, 251 (9th Cir. 1973); see also Bowen v. Amoco Pipeline Co., 254 F.3d 925, 931

10 (10th Cir. 2001) (citing *Aerojet* as authority that, "although parties to an arbitration agreement

11 may eliminate judicial review by contract, their intention to do so must be clear and

12 unequivocal.").[5]  The *Aerojet* court found that a clause that provided that arbitration was to be

13 "final and binding" did not show a clear intent to eliminate court review of the arbitrator's

14 decision.[6]  See Aeroject, 478 F.2d at 251-52; see also Goodall-Sanford, Inc. v. United Textile

15 Workers, 233 F.2d 104, 107 (1st Cir. 1956) (noting that a federal court may review an arbitration

16 award under 9 U.S.C. § 10 where the agreement provided for "final and binding" arbitration).

17      As noted above, Paragraph 9 states that the arbitrator's "rulings" are "binding, non-

18 reviewable, and non-appealable."  The clause is not limited simply to finality or making an

19 appeal, rather it seeks to prohibit *review* of the arbitrator's "rulings."  *Hoeft* and *Nextel* have non-

20 appealability clauses that use a variation of the word "review," either the actual word "review" or

21 the word "unreviewable." See Nextel, 146 Fed. Appx. at 552; Hoeft, 343 F.3d at 63.  The

22 clauses in *Aerojet* and *Rollins* do not contain any form of the word "review." See Rollins, 167

23 Fed.Appx. at 799 n.1; Aeroject, 478 F.2d at 251-52.  Because of its broad scope through the use

24 of the term "unreviewable," Paragraph 9 is more comparable to the clauses in *Hoeft* and *Nextel*,

25

26      [5]The Tenth Circuit may have tempered *Bowen* in light of the Second Circuit's opinion in *Hoeft*.  See
     MACTEC, Inc.  v. Gorelick, 427 F.3d 821 (10th Cir. 2005).  In *MACTEC*, the Tenth Circuit distinguished *Hoeft* on
27   the basis that, unlike *Hoeft*, the agreement before it did not seek to prohibit review by a district court of an
     arbitrator's decision.  See MACTEC, 427 F.3d at 829-30.

28
         [6]*Aerojet* involved an arbitrator's venue decision, not an arbitration award.  See Aerojet, 478 F.2d at 250-52.

than the clauses in *Aerojet* and *Rollins*.

The Court understands the concerns raised by, and the rationale of, *Hoeft*.  However, *Hoeft* cited *Aerojet* as one of the "far more scarce" decisions that appear to be willing to narrow the scope of review of an arbitration award.  See Hoeft, 343 F.3d at 64.  *Hoeft* parenthetically described *Aerojet* as noting in dicta that "parties to an arbitration agreement may eliminate judicial review by contract."  Id.  *Hoeft*'s characterization of *Aerojet* is the same as *Bowen*'s characterization of *Aerojet*, and appears to be correct.

In *Kyocera*, the Ninth Circuit indicated that parties agreeing to a narrower scope of review may be less problematic than parties agreeing to a broader scope of review, but the Ninth Circuit expressly did not decide the issue.  See Kyocera, 341 F.3d at 998 n.16.  Although *Kyocera* did not discuss *Aerojet*, it did not disavow the notion that the scope of review may be narrowed or severely limited.  Unless and until the Ninth Circuit clarifies *Aerojet*, the Court feels bound to follow *Aerojet*.  Since *Aerojet* acknowledges that parties may eliminate or restrict court review of arbitration proceedings, the Court does not believe that it can follow *Hoeft*.  See Aerojet, 478 F.2d at 251.

In contrast to *Hoeft*, the *Nextel* decision acknowledges that parties may limit the scope of review of an arbitration award.  The Third Circuit read the clause in that case, which made the arbitrator's "decisions . . . unreviewable for errors of law or legal reasoning," as allowing the parties to seek review of whether the arbitrator was "influenced by corruption, fraud, or partiality," or whether the arbitrator did not provide a hearing that considered a party's views prior to issuing a decision.  Nextel, 146 Fed. Appx. at 553.  Essentially, the Third Circuit's interpretation of that clause permitted review under § 10(a)(1), § 10(a)(2), and § 10(a)(3), but not § 10(a)(4).  Cf. 9 U.S.C. § 10(a).  This is consistent with language of that clause because that clause made the arbitrator's "decisions . . . unreviewable . . . ."[7]  Vacatur under § 10(a)(4) is appropriate where an arbitrator exceeds his powers, meaning that the arbitrator's award is completely irrational or is in manifest disregard of the law.  See 9 U.S.C. § 10(a)(4); Kyocera,

---

[7] Since vacatur of the arbitration award was at issue, it is apparent that the Third Circuit viewed the term "decisions" as encompassing the arbitration award.

341 F.3d at 997.  Thus, the substance of the arbitration award itself may be reviewed to a very limited degree through § 10(a)(4).  To have allowed review under § 10(a)(4) would have been to permit review of the arbitration "decision," which would be contrary to that non-appealability clause.  Cf. Nextel, 146 Fed. Appx. at 553.  On the other hand, §§ 10(a)(1)-(3) focus on partiality, bias, fraud, undue means, and misconduct/misbehavior.  See 9 U.S.C. §§ 10(a)(1)-(3).  That is, the substance of the arbitration award itself is not the focus of a review under §§ 10(a)(1)-(3), rather the arbitrator's conduct/the process of the arbitration is examined.  E.g., Haddad v. Jackson, 2010 U.S. Dist. LEXIS 71794, *11-*15, *18-*20, *25-*26 (E.D. Cal. July 16, 2010); Hernandez v. Smart & Final, Inc., 2010 U.S. Dist. LEXIS 60755, *18-*26 (S.D. Cal. June 16, 2010).  Since permitting a review of partiality, fraud, bias, undue means, or misconduct does not entail an assessment of the substance of an arbitration award, review under the standards of  §§ 10(a)(1)-(3) was not contrary to Nextel's non-appealability clause.  Although the clause in Nextel is not identical to the clause in the case at bar, the Court finds Nextel's treatment of that "non-appealability" clause to be instructive and consistent with Aerojet.

Here, Paragraph 9 clearly intends to limit the parties' ability to seek review of the arbitration rulings.  It expressly states that the "rulings" are to be "non-reviewable," in addition to being final and non-appealable.  See Respondent's Ex. 1.36.  The 2010 arbitration award is made in terms of "Rulings on Issues."  Respondent's Ex. A at pp. 6-8.  The Court believes that Paragraph 9's focus on the arbitrator's "rulings" is similar to Nextel's focus on the arbitrator's "decisions."  Both terms encompass the actual awards made.  Since § 10(a)(4) permits limited review of the substance of the arbitration rulings/awards, see Kyocera, 341 F.3d at 997, by agreeing to Paragraph 9, both parties agreed to waive their ability to seek vacatur under § 10(a)(4).  See Nextel, 146 Fed. Appx. at 553; accord Aerojet, 478 F.2d at 251.  In light of Aerojet, the Court does not see that Paragraph 9's limitation is improper.

Valent does not argue that the arbitrator engaged in any misconduct or denied a party the opportunity to be heard, see 9 U.S.C. § 10(a)(3), or that the arbitrator was biased or partial, see 9 U.S.C. § 10(a)(2), or that the award was procured through fraud or undue influence.  See 9 U.S.C. § 10(a)(3).  Instead, Valent relies exclusively on theories that fall under § 10(a)(4).  Since

Valent agreed not to seek review of the arbitrator's rulings, that is to attack the arbitration award through § 10(a)(4), Valent's motion to vacate will be denied.  See Nextel, 146 Fed. Appx. at 553; Aerojet, 478 F.2d at 251.

### C.   Vacatur Under 9 U.S.C. § 10(a)(4)[8]

*Respondent's Argument*

Valent argues that Ruling 2 must be vacated because the arbitrator exceeded his powers. First, the plain language of the Agreement states that, if Valent does not purchase the minimum quantity of CPPU, Valent can proceed under the Agreement as a nonexclusive seller of CPPU products without terminating the Agreement or buying minimum quantities.  Doc. 35 at 11:15-17.  Nothing in the Agreement requires Valent to chose between buying minimum quantities or forfeiting the licensing agreement.  Ruling 2 does not give effect to Valent's rights and expectations under the contract.  Second, Ruling 2 is completely irrational in that it cannot be reconciled with Ruling 1.  Ruling 1 concludes that Valent did not breach the Agreement by not buying minimum quantities of CPPU and operating under a non-exclusive license.  Ruling 2 contradicts this by concluding that Valent "has no right to sell CPPU (neither exclusive nor non-exclusive) unless [Valent] buys the 'minimum quantities.'"  Id. at 13:7-14:1.  The premises of Ruling 2 are that Valent has no right to a non-exclusive license and that Valent's failure to buy minimum quantities is a breach, which forces termination.  These premises were rejected in Ruling 1.  Third, Ruling 2 is contradictory to, and irreconcilable with, undisputed facts. Specifically, it was undisputed that Valent could sell CPPU products as a non-exclusive licensee without buying minimum quantities of CPPU from Kim.  In a March 2009 e-mail, in the pre-hearing brief, and in the testimony of Bruce Brown at the arbitration, Kim indicated that Valent could continue to buy CPPU without buying any minimum quantity.  Because it was undisputed that Valent had a non-exclusive right to continue to sell CPPU under the Agreement without the

---

[8]Given the state of the Ninth Circuit law as to whether parties may narrow the scope of arbitration review, as an alternative holding, the Court will analyze Valent's § 10(a)(4) arguments.  Cf. Nextel, 146 Fed. Appx. at 553-54 (enforcing non-appealability clause, but alternatively analyzing the grounds raised to vacate the award).

purchase of minimum quantities, the arbitrator could not have found that the Agreement required Valent to elect to either terminate or purchase minimum quantities.  Finally, the prior 2008 arbitration award did not dictate Ruling 2.  As the arbitrator indicated, the 2008 award did not consider exclusivity or non-exclusivity of the license or the effect nonexclusivity had on Valent's failure to purchase minimum quantities.  Further, the 2008 award did not limit Valent to only two choices.  The 2008 award gave Valent two choices, but did not foreclose others, it merely stated that Valent "can elect . . . ."

Valent argues that Rulings 3 and 4 exceed the arbitrator's powers because they disregard the specified mathematical formula that Valent must pay to Kim for CPPU.  The 2008 award stated that the formula by which to calculate the transfer price for all purchases after the 2008 award was 35% of the net distributor price.  It is undisputed that the net distributor prices in 2008 and 2009 were $10.85 and $11.00, respectively; 35% of these prices equals $3.80 in 2008 and $3.85 in 2009.  Since the 2008 award is unambiguous, the doctrine of *functus officio* makes the mathematical formula binding.  The failure of the arbitrator to follow the formula makes vacatur appropriate.

Valent argues that Rulings 5 and 6 should be vacated because they were premised entirely on Rulings 2, 3, and 4.  Because these rulings exceeded the arbitrator's powers, Rulings 5 and 6 should also be vacated.

### *Petitioner's Opposition*

Kim argues that the arbitrator made a reasonable and rationale interpretation of the Agreement.  When read in its entirety, the Agreement is ambiguous.  The Agreement does not clearly define the circumstances that render the Agreement nonexclusive.  The arbitrator acknowledged that, despite § 2.2, it appeared that the parties were contemplating an exclusive relationship.  The Agreement does not set forth how to proceed under a non-exclusive relationship.  No provision of the Agreement identifies the conditions or requirements in a nonexclusive relationship.  It would be highly prejudicial for Kim to be kept in limbo by letting Valent not purchase minimum quantities without the requirement that Valent terminate the agreement.  Further, at the arbitration, Kim presented evidence that it was still willing to

1   negotiate with Valent over the purchase of CPPU if the Agreement was terminated.

2        Additionally, the 2008 award required Valent to either purchase minimum quantities or

3   terminate the Agreement.  Valent did not appeal the 2008 award and cannot now challenge it.

4        Kim argues that Rulings 1 and 2 are not contradictory.  Ruling 1 addresses whether

5   Valent should be responsible for breaching the prior award.  Because the 2008 award did not

6   consider the issue of nonexclusivity and the Agreement does not clearly define the circumstances

7   that render the contract non-exclusive, Ruling 1 forgives Valent for acting in a manner that it

8   believed was lawful.  Ruling 2 clarifies how Valent must act going forward.

9        Kim argues that Rulings 2 is not irreconcilable with undisputed facts.  The undisputed

10   facts are simply admissions.  The admissions are not enough to vacate the award and do not

11   amount to legally dispositive facts.  Further, Brown's testimony indicated that, upon Valent's

12   failure to purchase minimum quantities, the license agreement becomes nonexclusive and leaves

13   open the question of what remedies are available to Kim.

14        As to Rulings 3 and 4, Kim argues that the 2008 award did not consider the effect of a

15   nonexclusive relationship.  Under a nonexclusive relationship, Kim can only be considered its

16   own distributor or unrestricted seller of CPPU, and the price can be set by Kim.  Any other

17   conclusion would put Kim in a crippling commercial disadvantage.  The arbitrator recognized the

18   possibility that the Agreement's quantity and pricing scheme may not apply in a nonexclusive

19   relationship.  Further, evidence was admitted from someone with 40 years experience in the

20   agriculture chemical business.  That person testified that he was aware of no instance where a

21   nonexclusive customer was able to control the purchase price of the product based on its sales to

22   someone else.  The Agreement's pricing structure was intended to apply when the parties had an

23   exclusive relationship, not when they had a nonexclusive relationship.

24        Finally, Kim argues that, because the arbitrator's award is reasonable and rational, Kim

25   remains the prevailing party and should be awarded fees, as set by Rulings 5 and 6.  Kim also

26   argues that it has incurred substantial legal fees in connection with efforts to confirm the 2010

27   award, including defending an action initiated by Valent in Illinois.  Under Illinois 710 ILCS

28   5/14, it is appropriate for Kim to be awarded additional attorney's fees (to be determined in a

13

subsequent motion).

*2008 Arbitration*

In 2008, an arbitrator made *inter alia* the following relevant rulings:

The transfer price for CPPU under the Agreement for the Operating Term of the Agreement shall be the price that is, on a per acre basis, no more than [35%] of the net distributor's price (on a per acre basis). This transfer price shall apply for any orders placed by [Valent] in or after 2008. Should such price fail to ensure Commercial Viability for either party, then the parties shall renegotiate the transfer price to ensure Commercial Viability.
. . . .

Section 2.2(c) of the Agreement requires the parties, upon request of either party, to meet and negotiate in good faith regarding the minimum annual purchase quantity of CPPU. Since the parties did not reach agreement on a revised minimum annual quantity, the quantity provisions in the Agreement will control, as calculated above.

Section 2.2(c) of the Agreement does not allow or require a renegotiation of the transfer price, which is set by Sections 6.2, 6.4, and Exhibit 8 of the Agreement. [Valent] apparently believed that the provisions of Section 6.4 were triggered and the parties met and conferred on a price adjustment. The parties did not reach agreement. Therefore, the transfer price of the Agreement from Section 6.2 and Exhibit 8.0 (as calculated above) will control. Claimant can either elect to proceed under the Agreement, and purchase the minimum annual quantities of product (as calculated above) at the transfer price calculated above or terminate the Agreement for lack of Commercial Viability.

Respondent's Exs. 6.9 (under "Ruling On Issue 5"), 6.10 (under "Ruling On Issue 9").

*2010 Arbitration*

As part of their Agreement, the parties agreed that they would submit proposed rulings on the issues presented. See Respondent's Ex. 1.36. The arbitrator was to adopt the entirety of a proposed ruling. See id. The arbitrator was prohibited from issuing a written opinion or otherwise explaining the basis of a ruling. See id.

Various disputes arose, and, in 2010, the parties submitted the following issues for the arbitrator to determine:

Issue No. 1:   Based on [Valent's] undisputed failure to purchase at least 120,000 grams for the Years 7/9/07 - 7/8/08 (actual purchase: zero grams) and 7/9/08 - 7/8/09 (actual purchase: 13,000 grams), is [Valent] in breach of the terms of the prior award? If so, is [Valent] obligated to pay [Kim] its lost profits on 120,000 grams not purchased for [7/9/07] - 7/8/08 and 107,000 grams not purchased for 7/9/08 - 7/8/09?

Issue No. 2:   Based on [Valent's] undisputed failure to purchase at least 120,000 grams for the Years 7/9/07 - 7/8/08 (actual purchase: zero grams) and 7/9/08 -

7/8/09 (actual purchase:  13,000 grams), is [Valent] required to either select to proceed under the Agreement and purchase the minimum annual quantities required going forward or terminate the Agreement for lack of Commercial Viability?  If so, should such an election be made within a defined period of time?

Issue No. 3:    What is the correct transfer price for [Valent's] order of 13,000 grams placed on or about March 18, 2009?

Issue No. 4:    What is the correct transfer price for [Valent's] order of 72,000 grams placed on or about September 28, 2009?

Issue Nos. 5 and 6:    Is [Kim] and or [Valent] entitled to attorney's fees and costs incurred in these further proceedings (and, if so, what is the amount)?

Respondent's Ex. A at pp. 5-6.

Prior to hearing closing arguments, the arbitrator explained various thoughts and concerns regarding the case, but emphasized that he had not made up his mind.  See Petitioner's Ex. C at 298:18-299:5.  The arbitrator stated:

The previous arbitration award [in 2008] affirmed the provisions of the agreement but didn't consider the issue of exclusivity or nonexclusivity and the effect of the failure of [Valent] to purchase the minimum quantity specified in the agreement.

So I have a prior arbitration award that says [Valent] is required to purchase 120,000 grams plus per year, and that the transfer price will be not exceeding 35% of [Valent's] net distributor price.  But can I now read into that words such as, "in order to maintain its exclusive arrangement, [Valent] must"?  Is that permitted?  Or do I have to accept the letter of the prior arbitration award, regardless of the context?
. . . .

So here are my questions.

Did the agreement contemplate anything other than an exclusive relationship?  And just to give you a little more guidance, I'm aware that there are words written into paragraph 2 that suggest that – or section 2 that suggest that [Valent] must meet those minimum purchase requirements in order to maintain its, quote, exclusive relationship, and I'm aware that if you read that paragraph in isolation, that would seem that it contemplates some other kind of relationship.

Yet when I look at the history of the negotiations that the parties have presented in evidence, the documentation, and I look at the recitals at the beginning of the agreement, it appears that the parties were always talking about and contemplating an exclusive relationship.

***So if this agreement is one that only governs the relationship between the parties, provided the relationship remains exclusive, that's one decision I need to make.***  Or is there room in this agreement for me to determine that a nonexclusive relationship is also permitted and contemplated, and then to determine what provisions will apply, if in fact the agreement is in fact deemed to be nonexclusive?

1    If the agreement is nonexclusive, or if the arrangement is nonexclusive, does this
     agreement contemplate that [Valent] can purchase whatever quantities it wants,
2    but Kim is still obligated to supply whatever quantities are ordered at that same
     price was applicable to the exclusive relationship? **The price that was sent in**
3    **the prior arbitration award is a price that does not exceed 35% of [Valent's]**
     **net distributor's rice.  Does that apply to the nonexclusive relationship?  And**
4    **where do I go in the agreement so that it can be interpreted so as to give**
     **meaning to all of the various parts of the agreement?**
5    If the agreement never contemplated anything other than an exclusive
     relationship, do both the quantity and the pricing provisions go away if [Valent]
6    elects to become nonexclusive?

7    Petitioner's Ex. C at 302:1-5, 303:14-305:9 (emphasis added).

8           After taking evidence and reviewing the submitted answers to the above issues and

9    hearing closing arguments, the arbitrator issued the following final award in March 2010:

10    <u>Ruling on Issue No. 1:</u>    No.  While [Valent] did not purchase 120,000 grams
      from 7/9/07 - 7/8/08, or from 7/9/08 - 7/8/09, that was not a breach of the parties'
11    Agreement or the terms of the prior award.  Rather, [Valent's] right to sell CPPU
      became non-exclusive.  Because there was no breach, [Kim] is not entitled to
12    recover lost profits.

13    <u>Ruling on Issue No. 2:</u>    The prior award, at page 10, lines 22-25, required VBC
      to elect to proced under the Agreement and purchase the minimum annual
14    quantities required going forward, or terminate the Agreement for lack of
      Commercial Viability. [Valent] has to date failed to purchase the minimum annual
15    quantities required but has not terminated the Agreement for lack of Commercial
      Viability. [Valent] shall make the election required by the original award within
16    30 days and notify [Kim] in writing as to whether [Valent] will either (1) proceed
      under the Agreement and purchase the annual minimum quantities required going
17    forward or (2) terminate the Agreement for lack of Commercial Viability, with
      said termination occurring at the time said notice is given.

18
      <u>Ruling on Issue No. 3:</u>    Although the correct transfer price was $9.33 per gram,
19    [Kim] invoiced [Valent] at a price of $8.83 per gram for the 13 kg shipment.
      [Valent] owes [Kim] the difference between the price and what [Valent] paid,
20    which is calculated as follows: [$65,390.00 (damages), plus $884.64 (pre-
      judgment interest), totals $66,274.64.]  [Valent] shall have 30 days to pay [Kim]
21    the foregoing sum.  Interest shall accrue on all unpaid amounts from the date of
      this [Award] until payment, at the legal Illinois rate of 9% per annum.
22
      <u>Ruling on Issue No. 4:</u>    The correct transfer price was $9.34 per gram. [Valent]
23    owes [Kim] the difference between that price and what [Valent] paid, which is
      calculated as follows: [$395,280.00 (damages), plus $663.60 (pre-judgment
24    interest), totals $395,913.60.]  [Valent] shall have 30 days to pay [Kim] the
      foregoing sum.  Interest shall accrue on all unpaid amounts from the date of this
25    [Award] until payment, at the legal Illinois rate of 9% per annum.

26    <u>Ruling on Issue Nos. 5 and 6:</u>    With respect to the recovery of attorney's fees and
      expenses, the Agreement requires the Arbitrator to allocate fees and expenses in a
27    way that bears a reasonable relationship to the outcome of the arbitration, with the
      party prevailing on more issues or on issues of greater value or gravity, recovering
28    a relatively larger share of its legal fees and expenses.  Based on the weight of the

respective issues, the Arbitrator has determined that [Kim] is the prevailing party in this Arbitration and is entitled to recover reasonable attorney's fees and expenses from [Valent].  After considering [Kim's] application and [Valent's] opposition thereto and allocating attorney's fees and expenses in a way that bears a reasonable relationship to the outcome of the Arbitration, the Arbitrator has determined that [Kim] has incurred reasonable attorney's fees and expenses in the amount [of] $25,542.05.  Accordingly, [Valent] shall pay to [Kim] the sum of $25,542.05 as reimbursement of reasonable attorney's fees and expenses in additional [sic] to the other amounts awarded hereunder.[9]

Id. at pp. 6-8.[10]

*Legal Standard*

The FAA provides that, if a party seeks a judicial order confirming an arbitration award, "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [the FAA]."  9 U.S.C. § 9; Bosack v. Soward, 586 F.3d 1096, 1102 (9th Cir. 2009); Kyocera Corp. v. Prudential-Bache T Servs., 341 F.3d 987, 997 (9th Cir. 2003) (en banc).  The FAA permits vacatur only:  (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.  9

---

[9]In the interim arbitration award, which is document 30-2 in the Court's docket, the arbitrator made the following finding with respect to fees and costs:

[Valent] has prevailed on Issue No. 1 whereby [Kim] seeks to recover $1,527,484.69 for [Valent's] alleged breach of the Agreement.  [Kim] has prevailed on Issue No. 2 relating to the requirement that [Valent] make an election to purchase the minimum quantities set forth in the Agreement and the prior award or terminate the Agreement. [Kim] has prevailed on the issue of the transfer price to be paid for the orders described in Issues Nos. 3 and 4.

The Agreement requires the Arbitrator to allocate fees and expenses in a way that bears a reasonable relationship to the outcome of the arbitration, with the party prevailing on more issues or on issues of greater value or gravity, recovering a relatively larger share of its legal fees and expenses.  Based on the weight of the respective issues, the Arbitrator determines that overall, [Kim] was 60% successful and [Valent] was 40% successful.  Accordingly, I hereby determine that [Kim] is the prevailing party and entitled to recover reasonable legal fees and expenses to the extent it was successful. . . .

[10]The arbitrator adopted Valent's proposed ruling on issue 1, but adopted Kim's proposed rulings on issues 2 through 6.

1   U.S.C. § 10(a); Kyocera, 341 F.3d at 997.  The burden of establishing grounds for vacating an

2   arbitration award is on the party seeking to vacate the award.  United States Life Ins., 591 F.3d at

3   1173 (9th Cir. 2010); Employers Ins. of Wausau v. National Union Fire Ins. Co. of Pittsburgh,

4   933 F.2d 1481, 1485 (9th Cir. 1991).  The review of an arbitration award is "both limited and

5   highly deferential."  Comedy Club, Inc. v. Improv West Assocs., 553 F.3d 1277, 1288 (9th Cir.

6   2009); Shoenduve Corp. v. Lucent Techs., Inc., 442 F.3d 727, 731 (9th Cir. 2006).  An

7   "arbitrator does not exceed its authority if the decision is a 'plausible interpretation' of the

8   arbitration contract," and "the court must defer to the arbitrator's decision as long as the

9   arbitrator . . . even arguably constru[ed] or appl[ied] the contract."  United States Life Ins., 591

10  F.3d at 1177.  However, "[a]n award that conflicts directly with the contract cannot be a

11  'plausible interpretation.'"  Frederick Meiswinkel, Inc. v. Laborers Local Union 126, 744 F.2d

12  1374, 1377 (9th Cir. 1984); Pacific Motor Trucking v. Automotive Machinists Union, 702 F.2d

13  176, 177 (9th Cir. 1983).

14          For purposes of § 10(a)(4), "[a]rbitrators exceed their powers when they express a

15  'manifest disregard of law,' or when they issue an award that is 'completely irrational.'"  Bosack,

16  586 F.3d at 1104; Comedy Club, 553 F.3d at 1290.  "This is a high standard for vacatur; '[i]t is

17  not enough . . . to show that the panel committed an error--or even a serious error.'"  Lagstein v.

18  Certain Underwriters at Lloyd's, 607 F.3d 634, 642 (9th Cir. 2010) (quoting Stolt-Nielsen S.A. v.

19  AnimalFeeds Int'l Corp., 130 S.Ct. 1758, 1767 (2010)).  Indeed, "[n]either erroneous legal

20  conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award

21  under the statute, which is unambiguous in this regard."  Bosack, 586 F.3d at 1102; Kyocera, 341

22  F.3d at 994.

23          "An award is completely irrational only where the arbitration decision fails to draw its

24  essence from the agreement."  Lagstein, 607 F.3d at 642; Comedy Club, 553 F.3d at 1288.  This

25  standard is "extremely narrow."  Bosack, 586 F.3d at 1106.  "An arbitration award draws its

26  essence from the agreement if the award is derived from the agreement, viewed in light of the

27  agreement's language and context, as well as other indications of the parties' intentions."

28  Lagstein, 607 F.3d at 642; Bosack, 586 F.3d at 1106.  "[T]he question is whether the award is

'irrational' with respect to the contract, not whether the panel's findings of fact are correct or internally inconsistent." Lagstein, 607 F.3d at 642; Bosack, 586 F.3d at 1106.  Further, "[courts] do not decide the rightness or wrongness of the arbitrators' contract interpretation, only whether the panel's decision 'draws its essence' from the contract." Bosack, 586 F.3d at 1106; New Maiji Market v. United Food & Comm'l Workers Local Union 905, 789 F.2d 1334, 1335 (9th Cir. 1985).

"'Manifest disregard of the law' means something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law." Lagstein, 607 F.3d at 642. "[T]o demonstrate manifest disregard, the moving party must show that the arbitrator underst[ood] and correctly state[d] the law, but proceed[ed] to disregard the same." Bosack, 586 F.3d at 1104; Collins, 505 F.3d at 879.  "[T]here must be some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it." Bosack, 586 F.3d at 1104; Collins, 505 F.3d at 879.  In some cases, "legally dispositive facts are so firmly established that an arbitrator cannot fail to recognize them without manifestly disregarding the law." Coutee v. Barington Capital Group, L.P., 336 F.3d 1128, 1133 (9th Cir. 2003).

*Discussion*

The rulings of the arbitrator in this case are pursuant to a "baseball style" arbitration.  See Abbott Labs. v. OraSure Techs., Inc., 2004 U.S. Dist. LEXIS 7063, *3 (N.D. Ill. April 23, 2004). As per the parties' agreement, the arbitrator adopts the entirety of one party's proposed ruling on an issue, and the arbitrator cannot make changes to that ruling or explain his rationale for choosing that ruling over the other.  See Respondent's Ex. 1.36.  This style of arbitration makes review by the Court difficult.  Depending on how detailed a ruling is, the format may require a court to speculate as to the arbitrator's rationale for choosing one side's proposed ruling over the other side's ruling.

The statements made by the arbitrator in this case indicate that he had a serious concern about the scope of the Agreement.  Specifically, whether the Agreement was meant to govern the parties' relationship only when Valent maintained its exclusive license or whether the Agreement

was meant to govern the parties' relationship under either an exclusive or nonexclusive license.[11] See Petitioner's Ex. C at 303:14-305:9.  Although the arbitrator was aware of the language in § 2.2 that stated that Valent's licence would be nonexclusive if Valent did not meet certain criteria, the arbitrator still had questions about the Agreement's scope based on the documentation submitted, the nature of the negotiations, and the recitals of the Agreement.  See Petitioner's Ex. C at 303:15-304:7.

Of particular importance is the recital that states that the parties wish to provide to Valent an "exclusive right to use, market, promote, and sell certain products containing the [Kim] technology for use on Grapes . . . ."  Respondent's Ex. 1.4.  Valent has pointed to only the single portion of § 2.2 that references a nonexclusive license.  Valent does not discuss the "exclusive right" recital, Kim's contention that the Agreement as a whole is designed for governing an exclusive relationship, or point the Court to any other provision of the Agreement that references or discusses a "nonexclusive" license.  Further, although the arbitrator did not reference what specific negotiations or which specific documentation caused him to question the scope of the Agreement, Valent has pointed the Court to no pre-Agreement document that indicates that the Agreement was meant to govern the parties relationship if Valent's license became non-exclusive.  It is Valent's burden to show that vacatur is appropriate.  See United States Life Ins., 591 F.3d at 1173.

From the arbitrator's statements, it is clear that in his mind he was required to resolve the scope of the Agreement in relation to a nonexclusive license by Valent.  The arbitrator could have relied on the structure of the Agreement and the recitals (particularly the recital that the parties intended to provide Valent with an "exclusive right"), various documentation, and negotiations to conclude that, although Valent has the option of having a nonexclusive license, the Agreement is not meant to govern the relationship between the parties once Valent's license becomes nonexclusive.  Cf. United States Life Ins., 591 F.3d at 1177 ("An arbitration award

---

[11]The parties acknowledge and rely on the premise that the 2008 arbitration award did not consider the issue of exclusivity or nonexclusivity of Valent's license.  See Court's Docket Doc. No. 35 at 16:18-23; Court's Docket Doc. No. 40 at 18:1-3.

draws its essence from the agreement if the award is derived from the agreement, viewed in light of the agreement's *language and context*, as well as *other indications* of the parties' intentions." (emphasis added)); Bosack, 586 F.3d at 1106 (same).  That is, the arbitrator could have interpreted § 2.2 as merely giving Valent the option of obtaining a nonexclusive license, but not setting the terms of the relationship under the nonexclusive license going forward.  Such an interpretation is not an express contradiction of § 2.2, and relying on *inter alia* the recitals of the contract to help interpret the effect of § 2.2 and the contract as a whole does not exceed the arbitrator's powers.  See United States Life Ins., 591 F.3d at 1177; Bosack, 586 F.3d at 1106. While perhaps not a correct interpretation of the contract, it is an interpretation that draws its essence from the contract.  See Bosack, 586 F.3d at 1106.

Consistent with the questions and concerns voiced by the arbitrator, if the Court assumes that the arbitrator found that the Agreement does not govern the parties' relationship in the event that Valent's license becomes nonexclusive, then Rulings 2 through 6 do not exceed the arbitrator's powers.

### 1.   Ruling 2

The Court is not persuaded by Valent's arguments that Ruling 2 exceeds the arbitrator's powers.

First, although the Court is not aware of a provision in the Agreement that expressly requires Valent to make an election between purchasing minimum quantities and termination, Valent was under the obligation to so chose pursuant to the 2008 award.  Ruling 2 by its express terms relies upon the prior 2008 award as the source of the election requirement.  As quoted above, the 2008 award stated that Valent could either purchase the minimum quantities of CPPU or terminate the Agreement.  See Respondent's Exs. 6.10.  Because arbitrations under the Agreement are binding, see Respondent's Ex. 1.36, and no party challenged the 2008 award, Kim and Valent were  bound by and required to follow the 2008 award.  See 9 U.S.C. § 12 (providing that motion to modify or vacate an arbitration award must be made within three months of filing or delivery of the award); Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement, 791 F.2d 1334, 1338-39 (9th Cir. 1986); Romero v. Citibank U.S.A., 551 F.Supp.2d 1010, 1012-13 (E.D. Cal.

2008).  The time for Valent to challenge the 2008 award was within three months of the delivery

or filing of the 2008 award.  See id.  Challenging the 2008 award, either implicitly or explicitly,

at this time is too late.  Valent was therefore required to either purchase the minimum quantities

set by the 2008 award or terminate the contract.[12]  See id.

Second, Ruling 1 and Ruling 2 are not irreconcilable.  Ruling 1 addresses the question of

whether Valent, in light of the Agreement's nonexclusivity provision, should pay for not

following the 2008 award's requirement to either purchase minimum quantities or terminate the

Agreement.  Ruling 2 addresses the question of whether Valent, in light of the Agreement's

nonexclusivity provision, is relieved of its obligation under the 2008 award to either purchase

minimum quantities or terminate.

The nature of the arbitration mandated by the parties amounts to a series of all or nothing

propositions.  The parties forced the arbitrator to choose, without comment or modification,

between two competing rulings.  In Ruling 1, the arbitrator chose the only ruling that reflected

the conclusion that Valent's choice to go nonexclusive was within the terms of the Agreement.

Because going nonexclusive was a possibility provided by the Agreement, it was reasonable for

the arbitrator to choose the only proposed ruling that acknowledged that option.[13]

Once the arbitrator concluded that going nonexclusive was a viable option to Valent and

adopted Ruling 1, he next had to decide whether that option should alter the requirements of the

[12]Valent's argument that the 2008 award did not dictate Ruling 2 is not persuasive.  Valent cites a portion of
the arbitrator's statements prior to hearing closing arguments in which he acknowledged that the 2008 award did not
consider exclusivity or nonexclusivity.  However, as quoted above, the arbitrator went on to ask whether he was
required to follow the letter of the 2008 award.  See Petitioner's Ex. C at 302:6-13.  The arbitrator was not
dismissing the 2008 award, and Valent cites no authority that requires the arbitrator to disregard a final, prior ruling.
Valent also argues that the award did not foreclose other options because the award said that "[Valent] can elect . . .
."  See Court's Docket Doc. No. 35 at 17:5.  This is a misquote.  The 2008 award stated, "[Valent] can either elect to
proceed under the Agreement, and [purchase minimum quantities] or terminate the Agreement for lack of
Commercial Viability."  Respondent's Ex. 6.10 (emphasis added).  The use of "either or" creates limited options.  A
natural reading of the 2008 award requires Valent to choose between these options, and that is how the arbitrator in
2010 (who was the same arbitrator in 2008) interpreted the 2008 award as evidenced by his adoption of Ruling 2.

[13]Kim's proposed ruling on issue 1 read: "Under the terms of the Award, [Valent] was required to purchase
the minimum annual requirements of CPPU.  For the period 7/9/07 – 7/8/08 and 7/9/08-7/9/09, that quantity was
120,000 grams per year. [Valent's] actual purchases were 0 grams for 7/9/07-7/8/08 and 13,000 grams for 7/9/08-
7/8/09.  Therefore, [Valent] must pay [Kim] its lost profit damages on the 120,000 grams not purchased for 7/9/07-
7/8/08 and the 107,000 grams not purchased for 7/9/08-7/8/09."  Respondent's Ex. C-21.

2008 award.  There is no dispute that Valent's license is no longer exclusive.  <u>See</u> Court's

Docket Doc. Nos. 46 at 8:15-16; 50 at 6:5-6.  If the arbitrator concluded that the Agreement was

meant to govern the parties under a nonexclusive license, then he would have chosen the ruling

that essentially rescinded the 2008 award's election requirement, i.e. Valent's proposed ruling

2.[14]  This is so because the arbitrator could not impose a requirement that does not appear in the

Agreement and that would be directly contrary to the Agreement's governance of a nonexclusive

relationship between the parties.  <u>See</u> <u>Frederick Meiswinkel</u>, 744 F.2d at 1377.  If the arbitrator

concluded that the Agreement was not intended to govern the relationship of the parties in a

nonexclusive license relationship, then the arbitrator would choose the proposed ruling that kept

the 2008 award's election requirement, i.e. Kim's proposed ruling 2.  This is so because the

Agreement's terms, which were meant to apply only to an exclusive license, would not have an

effect under a nonexclusive license situation.  That the arbitrator chose Kim's ruling as his final

Ruling 2 indicates that he concluded that the Agreement was not intended to govern the

relationship of the parties under a nonexclusive license.

In light of Valent's nonexclusive license, Ruling 1 and Ruling 2 answer separate

questions about liability for breach of duty and about the continued effect of the 2008 award's

election requirement.  The rulings are not irreconcilable.  <u>Cf.</u> <u>Bosack</u>, 586 F.3d at 1106.

Finally, the Court is not convinced that Ruling 2 is contrary to firmly established, legally

dispositive facts.  Valent points to the live testimony of Bruce Brown (a witness for Valent), one

line from a letter dated August 14, 2008, one line from an e-mail from March 2009, and one line

from Kim's arbitration pre-hearing brief.

The full line from the August 2008 letter, which is a letter from Kim's attorney to

Valent's attorney, is, "During their discussion, I am told that both [Kim] and [Valent] indicated

that they intended to sell products containing CPPU into the market in 2009 and that neither side

objected to the other making such sales."  Respondent's Ex. 59.  This line simply states that there

---

[14]Valent's proposed ruling on issue 2 read: "No.  While [Valent] could have elected to purchase the 'minimum quantities' set forth in the prior Award, or terminate the Agreement, [Valent] also could elect to become a non-exclusive seller fo CPPU. [Valent] elected to become a non-exclusive seller of CPPU under the Agreement." Respondent's Ex. C-2.

is no objection to both Kim and Valent selling CPPU, which is consistent with a nonexclusive license. The line says nothing about whether the Agreement will govern in a nonexclusive relationship.

The March 25, 2009, e-mail is from an officer of Kim to an officer of Valent. The cited line reads, "Although the parties are in agreement that [Valent's] failure to order the minimum quantities required rendered the agreement non-exclusive, we are unclear as to the geographic market and crop for which you intend to use the 13 kg of CPPU if delivered." Respondent's Ex. 62. A portion of the line does indicate that the agreement is non-exclusive. However, it is not clear what is meant by "the agreement." In the same line, Kim's officer goes on to require clarification about what geographic area the CPPU will be sold and for use upon what crops. See id. The Agreement's recitals, definitions, description of the license, and one addendum indicate that the crop on which CPPU is to be used is grapes and kiwis, and that the geographic area, i.e. "Territory," is the entire United States. See Respondent Exs. 1.4, 1.5, 1.6, 1.7, 1.42. If the Agreement governed a nonexclusive relationship, then Kim would not need clarification about what territory and for which crops Valent would be selling CPPU.

The line of the arbitration pre-hearing brief reads, "Thereafter, the contract became non-exclusive as a result of Valent's breach." Respondent's Ex. C-33. This line clearly states that the Agreement became nonexclusive. However, it does not state expressly that, once Valent's license became non-exclusive, the Agreement would continue to govern the relationship of the parties going forward. Further, and as discussed above, the line cited by Valent from the March 25 e-mail indicates that it was not clear that the Agreement governed going forward since Kim requested to know the territory and crop that Valent would target.

Finally, Valent cites the following lines from Bruce Brown's arbitration testimony:

Q:  Okay. And during that conversation, isn't it a fact that the parties agreed that [Valent] could go forward on a nonexclusive basis?

**A:  We were always fine, after the exclusivity was off, for [Valent] going ahead on a nonexclusive basis. That has always been true.**

Q:  And at that meeting, you didn't say, "Don't forget, you still need to buy 120,000 grams," did you?

**A:**      **At the point in that time that it became clear to us, which was - - it wasn't clear in the '07-'08 because they were taking the position that they had the right to buy the 120.  At some point in time, they finally acquiesced that they were nonexclusive.  And at that point in time, in my opinion, they don't have to buy the 120, because they're nonexclusive.**

Q:      And the notion that [Valent] could go forward as a nonexclusive was confirmed in [the August 14, 2008, letter]; correct?

**A:**      **Could they go forward as nonexclusive?  Yes, that is true today, they can go nonexclusive.  The issue is how they go.**

Respondent's Ex. B at 110:8-111:8.  Brown's testimony confirms that Valent's license was nonexclusive and that Valent could be nonexclusive going forward.  It does not say that the Agreement governed the parties' relationship going forward under Valent's nonexclusive license.  Brown's testimony concludes by saying the issue is how Valent goes nonexclusive.  If the Agreement governed the relationship of the parties when Valent has a nonexclusive license, there would not necessarily be an issue as to how Valent goes forward.  The fact that Brown testified that there was an issue as to how Valent goes forward shows that Kim was not clearly admitting that the Agreement governed the nonexclusive license going forward.[15]

The arbitration pre-hearing brief comes closest to an undisputed fact in Valent's favor.  However, an arbitrator only exceeds his powers when the award is contrary to a legally dispositive fact that is "firmly established."  Coutee, 336 F.3d at 1133.  The evidence indicates that there were questions about how the parties were to proceed going forward once Valent's license became nonexclusive.  It was not firmly established at the arbitration that the Agreement was to govern the parties going forward once Valent's license became nonexclusive.

Valent has the burden of showing that Ruling 2 exceeded the arbitrator's powers.  See United States Life Ins., 591 F.3d at 1173.  Valent has not met its burden.  Accordingly, the Court will not vacate Ruling 2.[16]

---

[15]In the reply brief, Valent cites another portion of Brown's testimony.  Like the testimony at pages 110 to 111, Brown's testimony at pages 101to 102 acknowledge that Valent could go nonexclusive, but does not state that the Agreement would continue to govern in a nonexclusive relationship.  See Petitioner's Ex. D at 101:13-102:11.

[16]Valent argues that Ruling 2 prohibits it from selling CPPU, even under a nonexclusive license.  However, Ruling 2 does not purport to explain whether the termination of the Agreement terminates Valent's ability to sell the CPPU that it has already purchased from Kim, especially the CPPU that was purchased when Kim understood the relationship to be nonexclusive.  Further, if the premise is accepted that the Agreement was not meant to govern the

1    2.    Rulings 3 and 4

2       The 2008 award stated that the price for orders of CPPU to Valent in or after 2008 was no

3    more than 35% of the net distributor's price on a per acre basis.  See Respondent's Ex. 6.9.  The

4    35% price appears to be derived from Paragraph 6.4 of the Agreement.  See Court's Docket Doc.

5    No. 50 at 10 n.2 (Valent cited Paragraph 6.4 for the proposition that the "transfer price formula

6    set in the 2008 award . . . had its genesis in the Agreement . . . .").  The 2008 award was made

7    with the understanding that Valent would have an exclusive license.  However, as both parties

8    acknowledge, and as the arbitrator stated, the 2008 award did not consider the effect of Valent

9    opting for a nonexclusive license.  If the arbitrator concluded that the Agreement was not meant

10   to govern a nonexclusive relationship, then reliance on the Agreement for setting the price of

11   future purchases would not necessarily be required.  This is especially true in light of Brown's

12   testimony that in 40 years in the business, he had never heard of a nonexclusive seller being able

13   to set the purchase price based on its sales to a third party.  Just as consideration of the

14   nonexclusive license caused the arbitrator to excuse Valent's failure to terminate or purchase

15   minimum quantities, i.e. Ruling 1, the nonexclusive license caused the arbitrator to set a new

16   purchase price.  The different contexts of the 2008 award and Rulings 3 and 4 of the 2010 award

17   make the rulings reconcilable, and justify the arbitrator in setting a price that differs from the

18   2008 award.  The 2008 award sets the purchase price when the parties are in an exclusive license

19   relationship, but the 2010 award sets the purchase price when the parties are in a nonexclusive

20   license relationship.  Given the new issue of nonexclusivity, Rulings 3 and 4 are not

21   irreconcilable with the 2008 award.  Vacatur is not appropriate.

22   3.    Rulings 5 and 6

23      Valent's arguments against Rulings 5 and 6 are completely dependent upon the Court

24   vacating Rulings 2, 3, and 4.  Valent offers no independent arguments for vacating Rulings 5 and

25   6.  As discussed above, Rulings 2, 3, and 4 will not be vacated because Valent has not

26   established that the arbitrator exceeded his powers.  Accordingly, the Court will not vacate

27

28   relationship of the parties going forward once Valent's license became nonexclusive, the Agreement would not
dictate how long the nonexclusive license would last because the Agreement governs an exclusive license.

1  Rulings 5 and 6.

2

3  **II.      MOTION TO CONFIRM ARBITRATION AWARD**

4          Under 9 U.S.C. § 9, "the court must grant such an order [to confirm an arbitration award]

5  unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [the

6  FAA]."  9 U.S.C. § 9; Bosack, 586 F.3d at 1102.   As discussed above, vacatur of the 2010

7  arbitration is not appropriate.   Therefore, the Court must grant Kim's motion to confirm the

8  arbitration award.   See id.

9          However, in its petition and in opposition to Valent's motion to vacate, Kim requests

10  attorneys fees pursuant to Illinois law.   The opposition clarifies that Kim is relying on 710 ILCS

11  5/14.   See Court's Docket Doc. No. 40 at p. 23.   That statute is part of the Illinois arbitration act.

12  It reads, "Upon the granting of an order confirming, modifying, or correcting an award, judgment

13  shall be entered in conformity therewith and be enforced as any other judgment.  Costs of the

14  application and of the proceedings subsequent thereto, and disbursements may be awarded by the

15  court as to the court seems just."  710 ILCS 5/14.

16          Kim's reliance on 710 ILCS 5/14 is problematic.   First, the Court has determined that the

17  procedures of the FAA, not the Illinois act, govern in these motions.   Second, Illinois case law

18  has determined that attorney's fees may not be awarded under 710 ILCS 5/14.   See Negro Nest,

19  LLC. v. Mid-Northern Mgmt., 838 N.E.2d 1083, 1090-91 (Ill. App. Ct. 2005); International

20  Fed'n of Prof'l & Tech. Eng'rs, Local 153 v. Chicago Park Dist., 812 N.E.2d 407, 412-13 (Ill.

21  App. Ct. 2004).   Because Kim has not shown that 710 ILCS 5/14 applies in this case, and

22  because 710 ILCS 5/14 does not authorize the award of attorney's fees, Kim's request for

23  attorney's fees beyond those awarded by the arbitrator (Rulings 5 and 6 above) will be denied.

24

25                                   **CONCLUSION**

26          First, Valent seeks to vacate five of six rulings of the 2010 arbitration award.  Vacatur is

27  not appropriate.  The parties agreed that the arbitration award was binding, non-reviewable, and

28  non-appealable.  Whether to vacate the award is determined by the FAA, and Ninth Circuit and

Third Circuit law indicate that Paragraph 9 prohibits review under 9 U.S.C. § 10(a)(4).  Since the grounds Valent relies upon fall exclusively under 9 U.S.C. § 10(a)(4), Valent has waived its ability make these arguments.  Denial of the motion is justified on this basis alone.  However, even if the Court does not uphold Paragraph 9, the arbitrator's rulings do not exceed his powers if it is assumed that he determined that the Agreement was not meant to govern the relationship of the parties going forward once Valent's license became nonexclusive.  Such an interpretation of the Agreement, while perhaps not correct, is not implausible, draws its essence from the Agreement, and has not been shown to contradict the express language of the Agreement.

Second, Kim seeks to confirm the 2010 award and also seeks attorney's fees.  As vacatur of the award is inappropriate, the Court must confirm the award.  However, because the Illinois law cited by Kim appears to be inapplicable, and in any event has been held to not authorize attorney's fees, Kim has shown no basis for the Court to award attorney's fees beyond the amount authorized by the arbitrator.

Accordingly, IT IS HEREBY ORDERED that:

1.    Respondent Valent's motion to vacate the 2010 arbitration award is DENIED;

2.    Petitioner Kim's motion to confirm the 2010 arbitration award is GRANTED;

3.    The arbitration award issued by arbitrator Michael Roberts and dated March 30, 2010, is CONFIRMED in its entirety;

3.    Petitioner Kim's request for attorney's fees is DENIED; and

4.    The Clerk shall enter judgment in favor of Petitioner and against Respondent in conformity with this order.

IT IS SO ORDERED.

Dated:    November 18, 2010                    _____
                                              CHIEF UNITED STATES DISTRICT JUDGE